Jimmie William **WADKINS**, Individually and as Court–Ordered Guardian of D'Ellen Wadkins, Non Compos Mentis, Plaintiff,

v.

**GULF COAST CENTERS, LTD.**, Gulf Coast Regional Mental Health–Mental Retardation Center, Home and Community–Based Center, and Bill McMillan, Defendants.

### No. CIV. A. G–99–116.

United States District Court, S.D. Texas, Galveston Division.

Dec. 14, 1999.

---

Edward D. Vickery, Royston Rayzor Vickery & Williams, Houston, TX, for Ed Vickery, mediator.

Stephen P Glover, Glover Bryant, Houston, Gerald W. Eddins, Eddins and Bennett, Port Arthur, TX, David A. Bryant, Jr., Glover Bryant, Houston, for Jimmie William Wadkins, plaintiff.

Carla Jean Cotropia, Mills Shirley, Houston, TX, for Gulf Coast Centers, Ltd., Gulf Coast Regional Mental Health–Mental Retardation Center Home and Community Based Center, Bill McMillan, defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff brings this action against Defendant Gulf Coast Centers, Ltd. ("Gulf Coast") alleging a violation of 42 U.S.C. § 1983. Plaintiff also has introduced a variety of pendant state claims against all Defendants under the Texas Tort Claims Act ("TTCA"), TEX. CIV. PRAC. & REM. CODE §§ 100.001–101.109 *et seq.* Now before the Court is Defendants' Motion for Summary Judgment, filed July 30, 1999. For the reasons stated below, the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

### I. FACTUAL SUMMARY

Plaintiff brings this case on behalf of his daughter, D'Ellen Wadkins. The complaint alleges an unbelievably gruesome set of facts that, if proven, reaffirms the unfortunate reality that to some in the community, shame holds no bounds. This tragic case involves Ms. Wadkins, a twenty-eight-year old mentally retarded woman who suffers from Down's Syndrome. From 1992 until January 20, 1995, she resided in a group home called Friendswood House. This facility provides residential care to retarded adults and is operated by Defendant Gulf Coast under license by the State of Texas. As such, Defendants acknowledge that Defendant Gulf Coast constitutes a governmental unit. *See Defs.' Mot. for Summ. J. at 3* (referring to TEX. HEALTH & SAFETY CODE § 534.001 (Vernon 1992)). Defendant Gulf Coast and its staff served as Ms. Wadkins' primary care givers at Friendswood House.

In 1994, Defendant Gulf Coast hired Defendant Bill McMillan and his wife Judy as "live-in parents" to manage the Friendswood residential facility and to supervise in the care of the home's three mentally incompetent residents. Defendant Gulf Coast also employed two case workers, Eugenia James and Sandra Kimble, to provide additional professional assistance at the Friendswood home. Approximately one year later, on January 18, 1995, Plaintiff asserted that Defendant McMillan sexually assaulted Ms. Wadkins, allegedly by using parts of his body as well as physical objects and utensils located in the Friendswood facility. After enduring such an allegedly horrific attack, Ms. Wadkins received immediate medical attention to care for an assortment of bruises and abrasions. Not surprisingly, this ordeal has had an enormous impact on Ms. Wadkins' psyche and mental stability. Consequently, Plaintiff alleges that Ms. Wadkins has suffered and likely will continue to suffer long-term mental trauma.

Because the case involves a violation by state actors based on a special custodial relationship, Plaintiff asserts claims under 42 U.S.C. § 1983. Specifically, Plaintiff alleges that Defendant Gulf Coast Center failed (1) to properly train staff members at the Friendswood House on reporting incidences of sexual assault against residents; and (2) to use professional judgment in investigating earlier reports of abuse allegedly committed by Defendant McMillan. These actions, according to Plaintiff, created circumstances that allowed the attack on Ms. Wadkins to occur. Plaintiff also has levied a number of pendant state claims, actionable under the Texas Tort Claims Act.

## II. ANALYSIS

### A. *Summary Judgment Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691, 693 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* FED. R. CIV. P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87, 106 S.Ct. at 1355–56 (quoting FED. R. CIV. P. 56(e)).

### B. *Plaintiff's Federal Claims Under 42 U.S.C. § 1983*

Defendants first allege that Plaintiff's 42 U.S.C. § 1983 claims are untenable as a matter of law. The Court, however, finds that Defendants' arguments are so untenable as to be facially ascinine.

### 1. *Plaintiff's Allege a Deprivation of a Recognized Constitutional Right*

 Section 1983 provides a claim against anyone who, "under color of" state law, deprives another of his or her constitutional rights. 42 U.S.C. § 1983 (1994); *see, e.g., Collins v. City of Harker Heights,* 503 U.S. 115, 120–21, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992). Therefore, to sustain his Section 1983 action, Plaintiff must first prove a violation of an underlying constitutional right. *See Daniels v. Williams,* 474 U.S. 327, 329–30, 106 S.Ct. 662, 663–64, 88 L.Ed.2d 662 (1986). In this case, it cannot be disputed that sexual assault committed upon an institutionalized mentally retarded individual by a staff person working at a state-regulated group home is an unconstitutional intrusion into the mentally retarded resident's bodily safety. *See Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (noting that under the Fourteenth Amendment the state holds "the unquestioned duty to provide reasonable

safety for all residents and personnel within" group homes serving the mentally retarded); *Ingraham v. Wright,* 430 U.S. 651, 673 & n. 41, 97 S.Ct. 1401, 1413 & n. 41, 51 L.Ed.2d 711 (1977) (holding that the Due Process Clause protects individuals from "unjustified intrusions on personal security"); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." (citing *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2458–59)); *cf. Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 451 (5th Cir.1994) (en banc) ("If the Constitution protects a school child against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a school child from physical abuse ... by a public schoolteacher"); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 727 (3d Cir.1989) (arguing that "a teacher's sexual molestation of a student could not possibly be deemed an acceptable practice").[1] Consequently, because the record suggests that Defendants took Ms. Wadkins involuntarily into its physical custody and control, the Court finds that Defendants had an affirmative constitutional obligation to protect Ms. Wadkins. *See DeShaney,* 489 U.S. at 199–200, 109 S.Ct. at 1005–1006 (indicating that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through institutionalization, or other similar restraint of personal liberty—which is

the 'deprivation of liberty' triggering the protections of the Due Process Clause"). In the end, the law clearly establishes that involuntarily committed patients such as Ms. Wadkins have a constitutional right to live in a safe environment.

### 2. *The Court Evaluates Plaintiff's 1983 Claims According to the "Professional Standards" Test*

While Plaintiff has clearly alleged a viable constitutional violation, liability cannot be imposed upon a state entity for a constitutional violation on the basis of a respondeat superior or a vicarious liability theory. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–26, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (1988). Instead, Plaintiff must rely on either a "special relationship" or "deliberate indifference" theory. Defendants argue that deliberate indifference is the appropriate standard with which to evaluate Plaintiff's Section 1983 claims. Defendants have failed, however, to reconcile their position with the Supreme Court's decision in *Youngberg v. Romeo.* In addition to recognizing the special relationship created when state actors involuntarily commit retarded persons to state custody, the Supreme Court in *Youngberg* adopted the "professional judgment" test as the appropriate standard for evaluating whether an involuntarily confined mentally retarded person's constitutional right to safety has been violated. *See Youngberg* 457 U.S. at 323, 102 S.Ct. at 2452. The professional judgment test provides that "liability may only be imposed when the decision by the

---

1. The record provided to the Court does not indicate whether D'Ellen Wadkins was involuntarily committed to state custody. The only information relevant to such a determination comes from Plaintiff's pleadings, which note that Ms. Wadkins "has been recognized legally as a mentally incompetent adult." *Pl.'s Second Amended Orig. Pet. at 2.* For the purposes of this summary judgment motion, the Court—evaluating the facts in a light most favorable to the nonmovants and noting the absence of contrary evidence submitted by Defendants—assumes that Defendant Gulf Coast, as an undisputed state actor, held a

special custodial relationship with Ms. Wadkins at the time of the alleged sexual assault. To further support this conclusion, the Court also notes that Defendants have not alleged that Ms. Wadkins, while staying at Friendship House, had the freedom to leave the facility at any time. Consequently, given Ms. Wadkins' mental condition (not to mention Defendants' surprisingly insufficient briefing on this issue), the Court infers that Ms. Wadkins entered into state custody without her consent and thereby enjoys a special relationship with Defendants—one that entitles her to the protections enunciated in *Youngberg v. Romeo.*

professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* In this case, the Court employs the special relationship theory, because Plaintiff's claims assert that negligent implementation of Defendant Gulf Coast's official policies created conditions that allowed the sexual abuse allegedly committed by a "state" employee against Ms. Wadkins, who was housed in a state-supervised environment. In light of the fact that Plaintiff's case implicates the same substantive due process rights recognized in *Youngberg,* the Court views the professional judgment test as the proper standard for evaluating the evidence in this case.[2]

### 3. Disputed Evidence Exists Regarding Whether Defendants' Carried Out a Custom or Policy that Triggers Liability

At the outset, Defendants claim that Plaintiff has failed to show grounds for liability based on Defendant McMillan's alleged molestation of Ms. Wadkins because Plaintiff has not shown that an official policy or custom caused the deprivation of rights asserted in this case. Conversely, Plaintiff asserts that Defendants are liable because Mr. Danny Armond—an employee of Defendant Gulf Coast and Defendant McMillan's supervisor—failed to ensure that all training and reporting requirements regarding allegations of abuse of Friendswood House residents were met. Specifically, Plaintiff points to evidence indicating that although official policy required staff at Friendswood House (1) to report suspect-

ed abuse, (2) to conduct full investigations on all incidences of reported abuse, and (3) to attend annual training seminars on abuse detection and reporting procedures, the policymakers in charge at Gulf Coast apparently disregarded these official policies, perhaps to the detriment of Ms. Wadkins. Consequently, Plaintiff alleges that these lapses in policy enforcement created an environment that gave rise to Defendant McMillan's alleged sexual assault of D'Ellen Wadkins.

■■ Having outlined the general arguments of the parties, the Court now turns to the merits. To be liable under Section 1983, Defendant Gulf Coasts' policies or customs must be the "moving force [behind] the constitutional violation." *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). In an effort to meet this burden, Plaintiff has produced evidence that by 1992 Defendant Gulf Coast had implemented a comprehensive set of training and reporting requirements mandating that staff members respond quickly and effectively to suspected cases of abuse at Friendship House. *See Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. A* (referring to the standards adopted by Defendant Gulf Coast regarding the detection, documentation, and reporting of signs of possible abuse—policies that included an annual, mandatory sexual and physical abuse training component). Plaintiff then proceeds to juxtapose these training and reporting requirements with evidence that on numerous occasions supervisors at Friendswood House have, in fact, failed to follow Defendant Gulf Coast's official, written policies. *See, e.g., Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. 2 at 11* (disclosing

---

2. No doubt the Court may have reached an entirely different result regarding the applicable standard for determining liability had Defendants presented evidence indicating either that Ms. Wadkins had not been involuntarily confined to the custody of Defendant Gulf Coast, or that the Friendship House facility more closely resembled a boarding home that allowed its residents freedom of movement. If such evidence had been presented, applying the special relationship test would have been

a more dubious proposition. With that in mind, however, Defendants should note that the disputed testimony reviewed thus far by the Court raises sufficient factual questions regarding the conduct of all Defendants so as to properly defeat the Motion for Summary Judgment even under the heightened deliberate indifference standard. *See Doe,* 15 F.3d at 457 n. 12 (noting that deliberate indifference often is a fact-laden question).

that Defendant Gulf Coast's training records reveal that during the five years he worked for Defendant Gulf Coast, Defendant McMillan *never* received *any* sexual or physical abuse training); *Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. 1 at 15* (noting that according to Defendant Gulf Coast's training records Eugena James failed to receive abuse training from 1994 through the time of the alleged incident with Plaintiff). In fact, Plaintiff points to a report issued by the Texas Department of Protective and Regulatory Services ("TDPRS") after investigating a bruise Ms. Wadkins suffered in September 1994—four months prior to the date of Ms. Wadkins' alleged rape. The report cites concerns "that the bruise discovered in September was not properly documented" and recommends that "[t]he policy of documenting injuries or incidences may need to be clarified for the staff members ...." *Defs.' Mot. for Summ. J. Ex. B at 7.* Each of these pieces of evidence raise material fact questions regarding the existence of a supposed unofficial policy or custom that serves (1) to condone lax compliance with Defendant Gulf Coast's abuse reporting requirements and (2) to permit employees to care for residents at the Friendswood Home without undergoing proper abuse training—training that Plaintiff asserts may have prevented Ms. Wadkins' injuries.

Plaintiff also offers deposition testimony concerning the event that precipitated the April 1995 visit from the TDPRS. In September 1994—again, four months prior to the time of Ms. Wadkins' alleged sexual assault—Ms. James reported to Mr. Armond that she had discovered signs of abuse on Ms. Wadkins' thigh. At the time, Ms. James noted that Ms. Wadkins had become withdrawn when in the presence of Defendant McMillan. In addition to sharing these concerns with Mr. Armond, Ms. James claims that she also notified him of several other unusual circumstances occurring relative to other residents at the Friendship House. *See Dep. of Eugena James at 63–64, 67.* Ms. James then alleges that when she raised the possibility that Defendant McMillan may have been the cause of Ms. Wadkins' bruising, Mr. Armond responded by saying "Gena, it is not so. [The McMillans] are good people. I think it's a misunderstanding. We need to be careful as to when we state things because things can be misunderstood." *Id.* at 64. According to Ms. James, Mr. Armond did not investigate these allegations of abuse; in fact, TDPRS did not begin its abuse and neglect investigation report regarding the September incident until April 24, 1995. If true, all of this evidence hints at a pattern of questionable administrative decisions on the part of Defendant Gulf Coast, thereby raising the possibility that Defendant Gulf Coast may have, in fact, "adopted" an unofficial policy of not investigating allegations of abuse at Friendship House. If the evidence ultimately substantiates these allegations, then Plaintiff will have a proper basis for arguing that, prior to the January 1995 rape, Defendant Gulf Coast had created an environment in which the physical safety of each resident at Friendship House, including Ms. Wadkins, was jeopardized.[3]

---

3. In evaluating the evidence, the Court did not consider the allegation asserted in footnote 2 of Plaintiff's Response to Defendant's Motion for Summary Judgment that Defendant McMillan pled *nolo contendere* to charges of sexually assaulting Ms. Wadkins. On a practical level, this evidence is inadmissible because Plaintiff failed to submit proof of such a plea. But even if Plaintiff had made a proper submission, Defendants contend the evidence would be inadmissible, pursuant to Rule 410(2) and Rule 803(22) of the Federal Rules of Evidence. Rule 410(2) provides that a plea of *nolo contendere* "is not, in any civil or criminal proceeding, admissible against the defendant who made the plea." FED. R. EVID. 410(2). Clearly, 410(2) precludes Plaintiff from using evidence of a plea of *nolo contendere* against Defendant McMillan, but the qualifying language "against the person who made the plea" appears to prevent Defendant Gulf Coast from seeking the same protection. To determine if the alleged plea could be excluded as to Plaintiff's civil claims against Defendant Gulf Coast, the Court turns to Rule 803(22), which recognizes a hearsay exception to "evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of *nolo contendere*)" when used "to prove any fact essential to

After evaluating the totality of the evidence presented, the Court finds that Plaintiff has raised triable issues regarding whether Defendant Gulf Coast has consistently deviated in the enforcement of its official policies so as to violate applicable professional standards of practice and conduct. Moreover, there exists conflicting evidence as to whether alleged deviations from Defendant Gulf Coast's official policy jeopardized Ms. Wadkins' constitutional rights. For these reasons, the Court finds it unreasonable to quash Plaintiff's claims as a matter of law.

### 4. Plaintiff's Section 1983 Claim is Timely

■ Defendant next claims that Plaintiff's Section 1983 claims are time barred. The Court disagrees. Although Plaintiff added the Section 1983 cause of action to its complaint on February 19, 1999—four years after Plaintiff's claim of sexual assault—Plaintiff had filed its original suit two years earlier, on January 19, 1997, within the proper statute of limitations period. Because Plaintiff's amended Section 1983 action arises out of the same occurrence set forth in the original complaint, Rule 15(c)(2) of the Federal Rules of Civil Procedure permits Plaintiff to supplement his original complaint with the Section 1983 action. Rule 15(c)(2) provides that Plaintiff may relate his Section 1983 cause of action back to the date of the original pleading if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleadings." FED. R. CIV. P. 15(c)(2). Having satisfied the conditions set forth in Rule 15(c)(2), Plaintiff's Section 1983 claim remains viable. See Bularz v. Prudential Ins. Co., 93 F.3d 372,

379 (7th Cir.1996) (noting that relation back is permitted under Rule 15(c)(2) when "an amended complaint asserts a new claim on the basis of the same core of facts, but involving a different substantive legal theory than that advanced in the original pleading" (citing Donnelly v. Yellow Freight Sys., Inc., 874 F.2d 402, 410 (7th Cir.1989), aff'd on other grounds, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990))).

In the end, the Court finds that there exists a genuine issue of material fact as to Plaintiff's Section 1983 claim, namely whether Defendant Gulf Coast disregarded its training policies, and whether the company negligently dismissed earlier reports of abuse allegedly committed by Defendant McMillan at the Friendship House. The Court also holds that Plaintiff's Section 1983 action does not implicate a statute of limitations bar. Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's Section 1983 claim is DENIED.

### C. State Law Claims

■ Texas municipality cannot be held liable for causes of action brought under Texas common law unless the Texas Legislature has expressly waived governmental immunity. See University of Texas Medical Branch v. York, 871 S.W.2d 175, 177 (Tex.1994). This immunity has only been waived as to claims brought pursuant to the Texas Tort Claims Act ("TTCA"), TEX. CIV. PRAC. & REM. CODE ANN. § 100.001–101.109 (Vernon 1997). See Lowe v. Texas Tech Univ., 540 S.W.2d 297, 298–99 (Tex. 1976). Thus, Plaintiff's common-law causes of action against Defendant Gulf Coast are not legally cognizable unless they are clearly waived by the TTCA. See

---

sustain the judgment ...." FED. R. EVID. 803(22). This case does not appear to implicate Rule 803(22). The Advisory Notes to Rule 803(22) indicate that pleas of nolo contendere are exempted from Rule 803(22) in order to make Rule 803(22) "consistent with the treatment of nolo pleas in Rule 410." FED R. EVID. 803(22) advisory committee's note. Given that Rule 410(2) only prevents the use

of nolo pleas against the person making the plea, the Court remains skeptical that Defendant Gulf Coast would receive any greater evidentiary protection under Rule 803(22) than it would under Rule 410. If, however, this issue becomes relevant at trial, the Court nevertheless reserves the right to exclude all such evidence against all parties under Rule 403.

*York,* 871 S.W.2d at 177; *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980). However, the TTCA also provides that Defendants cannot be liable for any claims "arising out of assault, battery, false imprisonment, or any intentional tort . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 101.057(2).

Defendants first allege that Plaintiff's actions are barred by immunity because they all arise out of her rape and therefore fall within intentional tort exemption of Section 101.057(2) of the TTCA. Defendants, however, have misconstrued the nature of Plaintiff's state claims. A review of the complaint reveals that Plaintiff has alleged negligence claims, which, under the TTCA, are proper grounds for waiving immunity. Specifically, Plaintiff asserts that Defendant Gulf Coast, through negligent implementation of its written policies, placed Ms. Wadkins in a dangerous situation, thereby increasing the risk that she would be injured. Therefore, Section 101.057(2) of the TTCA does not preclude a state-based claim against Defendant Gulf Coast, because Plaintiff's claims do not arise out of an intentional tort allegedly committed by Defendant McMillan. Instead, the claims arise out of the antecedent negligence of Defendant Gulf Coast's management. *See City of Waco v. Hester,* 805 S.W.2d 807, 812 (Tex. App.—Waco 1990, writ denied) (noting that a claim is sustainable under the TTCA if it "arose out of the antecedent negligence of the City's employees"); *see also Delaney v. University of Houston,* 835 S.W.2d 56, 60 (Tex.1992) (observing in the context of immunity under Section 101.057 of the TTCA that "intentional conduct intervening between a negligent act and the result does not always vitiate liability for the negligence").

Defendants next argue that even if Plaintiff alleges negligence, such claims are barred by sovereign immunity under Section 101.021 of the TTCA. This statute waives governmental liability for the negligent conduct of employees acting within the scope of their employment, if such negligence arises from the operation or use of motor vehicles or equipment, or from a defective condition or use of real or tangible personal property, and if under the circumstances a private person would be liable under Texas law. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021. Plaintiff claims that Ms. Wadkins' injuries were proximately caused by negligent actions involving a "condition or use" of tangible or real property. As the Texas Supreme Court has stated, "use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 33 (Tex.1983).

As noted previously, Defendant Gulf Coast formulated policies to protect Friendswood House residents from abuse. Based on the evidence forwarded by Plaintiff there appear to be facts indicating that Defendant Gulf Coast knew of should have known that Defendant McMillan may have abused Ms. Wadkins previously, but that officials at Gulf Coast chose not to act upon that information and thereby prevent Defendant McMillan from having further interaction with Ms. Wadkins. Therefore, there seems to exist a factual issue regarding whether (1) the evidence is sufficient for a jury to find that by "using" the Friendswood facility to continue to house Ms. Wadkins with Defendant McMillan, Defendant Gulf Coast negligently implemented its abuse prevention policies, and (2) whether a sufficient nexus exists showing that this negligence contributed to bringing about the sexual assault, which otherwise might not have occurred. *See Hester,* 805 S.W.2d at 815 (holding when a city's negligent violation of its policies regarding the segregation of violent of homosexual prisoners became a substantial factor in leading to the rape of an inmate, the "use of" requirement included in Section 101.021 is satisfied).[4] Consequently, De-

---

4. The Court does, however, agree with Defendants that Plaintiff cannot claim liability based exclusively on the fact that Defendant McMillan allegedly raped Ms. Wadkins "us-ing" physical utensils and objects taken from the Friendswood House facility. *See Dallas County Mental Health v. Bossley,* 968 S.W.2d

fendant's Motion for Summary Judgment as to claims brought under the TTCA is **DENIED.**[5]

### D. *Claims Brought by Jimmy Wadkins in His Individual Capacity*

Finally, Defendants argue that Plaintiff has failed to set forth a proper basis from which to bring an individual claim. Defendants claim that "Mr. Wadkins would not have a state court claim for a bystander cause of action because he does not meet the elements of that cause of action." *See Defs.' Mot. for Summ. J. at 14.* Noting that Mr. Wadkins was not at the scene of the alleged assault, Defendants cite *U.S.A.A. v. Keith,* 970 S.W.2d 540 (Tex. 1998), for the proposition that Mr. Wadkins does not have adequate grounds to bring a bystander claim. *See Dep. of Jimmie Wadkins at 93–94* (admitting that he learned about the alleged assault on his daughter days after it supposedly occurred). Rather shockingly, Plaintiff failed to respond to this portion of Defendant's Summary Judgment Motion in either his Motion Response to Defendants' Motion for Summary Judgment, filed October 15, 1999, or his Supplemental Response to Defendants' Motion for Summary Judgment, filed November 23, 1999. The Court therefore treats Defendant's Motion for Summary Judgment as to this claim as unopposed, pursuant to Local Rule 6(e). Accordingly, Defendant's Motion for Summary Judgment regarding Plaintiff Jimmy Wadkins' individual claims is **GRANTED.**

339, 342 (Tex.) ("Property does not cause injury if it does no more than furnish the condition that makes the injury possible."), *cert. denied,* — U.S. —, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998). Such an allegation also would go to Defendant's liability for the commission of an intentional tort, which, as the Court has explained, would not waive immunity under the TTCA.

5. This holding also applies to Defendants' assertion that Plaintiff's state-based claim against Defendant McMillan is barred. De-

### III. CONCLUSION

This case presents rather egregious allegations of abuse and managerial negligence. If at trial Plaintiff can prevail in demonstrating that Defendant Gulf Coast's failure to follow official policy resulted in the injuries suffered by Ms. Wadkins, Defendants will likely face enormous liability. With that in mind, the Court *strongly* admonishes Defendants to earnestly consider the possibilities for settlement of this case. That recommendation notwithstanding, the parties are **ORDERED** to comply with all docket obligations imposed at the June 22, 1999 Scheduling Conference. No exceptions to the deadlines will be made. Rest assured, this case *will* go to trial as scheduled.

The parties are also **ORDERED** to file no further pleadings on these issuer in this Court, including motions to reconsider and the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

fendant's provide no pertinent authority or argument supporting their position; instead, Defendants syllogize that because the claim against Defendant Gulf Coast is barred because of governmental immunity, the claims levied against Defendant McMillan must be barred as well. But, because the Court has ruled that Plaintiff's claim pierces Gulf Coast's immunity under the TTCA, Defendants' arguments regarding the dismissal of claims against Defendant McMillan necessarily fail.