UNIVERSITY OF TEXAS MEDICAL
BRANCH AT GALVESTON,
Petitioner,

v.

Robert YORK as Guardian of Richard
Allen York, Respondent.

No. D–1208.

Supreme Court of Texas.

Feb. 2, 1994.

Rehearing Overruled March 30, 1994.

J. Mark Holbrook, Austin, for petitioner.

John A. Buckley, Jr., Andrew J. Mytelka, Janet L. Rushing, Thomas W. McQuage, Galveston, for respondent.

ENOCH, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, and GONZALEZ, HIGHTOWER, HECHT and CORNYN, Justices, join.

In this case, we revisit the issue of whether the use, misuse, or nonuse of information which is recorded in a patient's medical records is a use of tangible personal property under § 101.021 of the Texas Tort Claims Act (Act) and thus satisfies a condition for waiver of governmental immunity. TEX.CIV.

PRAC. & REM.CODE ANN. § 101.021(2) (Vernon 1986). While paper itself can be touched, handled, and seen, medical information recorded on paper is not tangible personal property. The State has not waived immunity from liability for negligence involving the use, misuse, or nonuse of medical information. We reverse and render judgment in favor of the University of Texas Medical Branch at Galveston.

Robert York as guardian for his son Richard, brought suit against the University of Texas Medical Branch at Galveston (UTMB) for negligence in failing to diagnose a broken hip. Richard was severely injured in a car accident that left him partially paralyzed and functionally impaired. After improving in outpatient therapy, Richard was admitted to a special inpatient program at UTMB for additional therapy. Shortly after he was admitted on August 13, 1984, Richard broke his hip. UTMB did not diagnose the broken hip until August 22. York alleges that UTMB's failure to diagnose caused Richard to suffer severe pain, withdrawal, depression, and regression in his rehabilitation.

York asserts that UTMB misused tangible personal property by failing to note in Richard's medical records the events of August 14, the day York alleges Richard broke his hip, and in failing to memorialize in writing numerous other observations concerning Richard's condition made by Richard's parents when visiting Richard at UTMB. York also asserts that UTMB misused Richard's medical records by failing to follow a recommendation noted in the records for an x-ray of Richard's hip. York contends that this misuse of Richard's medical records prevented an earlier diagnosis of the broken hip. The jury returned a verdict for York, and the trial court rendered judgment on the verdict. The court of appeals affirmed, but reformed the judgment to reflect an award of post-judgment interest. 808 S.W.2d 106, 112.

UTMB contends that it is immune from liability under the Tort Claims Act. TEX.CIV. PRAC. & REM.CODE ANN. § 101.021(2). In addition, UTMB asserts that there is no evidence that its doctor relied on, or reviewed, the information contained in Richard's records in formulating a diagnosis or that the standard of care required the doctor to review Richard's medical records in conducting an examination or before making a diagnosis. UTMB also argues that the court of appeals erred in reforming the judgment to allow for post-judgment interest. We agree that UTMB has governmental immunity and therefore, do not reach UTMB's remaining points of error.

I.

This Court considered the scope of governmental immunity arising from alleged negligent use of a patient's medical records in *Texas Department of Mental Health and Mental Retardation v. Petty*, 848 S.W.2d 680, 686 (Tex.1992). In that case, the plaintiff sued TDMHMR for negligence in misusing her institutional medical records, thereby misdiagnosing her mental condition and resulting in her prolonged confinement in mental institutions. In a plurality decision, a divided Court concurred in the judgment affirming the judgment of the court of appeals and the trial court awarding the plaintiff recovery under the Tort Claims Act. *Id.* at 685. However, no majority for the Court expressed a single rationale supporting the judgment rendered in that case. Rather, four justices concluded that the plaintiff's treatment records were tangible personal property, the misuse of which would subject the State to liability under the Tort Claims Act. *Id.* at 684. Four justices dissented, concluding that medical records are not tangible personal property and that the plurality had virtually eliminated any analysis of proximate cause in assessing waiver under section 101.021(2).[1] *Id.* at 682. In affirming the lower court's judgment in *Petty* without a majority agreement on the reasons supporting the judgment, the judgment itself has very limited precedential value and would control the result only in identical cases. *See* Linda Novak, Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80

---

1. The remaining justice, former Justice Eugene A. Cook, concurred in the judgment only without expressing any opinion.

COLUM.L.REV. 756, 756–758 and 779 (1987). Because the principles of law involved have not been agreed upon by a majority of the sitting court, the plurality opinion is not authority for determination of other cases, either in this Court or lower courts.

Furthermore, because *Petty* was affirmed without a coherent majority rationale, it is our duty to endeavor to resolve issues as important as waiver of governmental immunity so as to provide a reasoning that may offer guidance not only for the parties, but for future litigants, the bench, the bar, and the general public in shaping their conduct and decisions. *See* Novak, *supra,* at 757–8 (footnotes omitted). While we may look to *Petty* for guidance, we are not bound by the result in that case and must consider anew the issue of governmental immunity for negligent use of information contained in a patient's medical records.

## II.

■ Under the doctrine of sovereign immunity, the State is not liable for the negligence of its employees absent constitutional or statutory provision for liability. *Lowe v. Texas Tech University,* 540 S.W.2d 297, 298 (Tex.1976). In 1969, the Legislature enacted the Texas Tort Claims Act to waive governmental immunity only in certain circumstances. Tort Claims Act, 61st Leg., R.S., ch. 292, 1969 Tex.Gen.Laws p. 874.[2] The Texas Tort Claims Act did not abolish the doctrine of sovereign immunity.

Section 101.021 of the Tort Claims Act sets out the waiver of immunity. That section provides that a governmental unit is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within the scope of his employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986).

■ In construing this waiver of governmental immunity, we are guided by three principles. First, the waiver of governmental immunity is a matter addressed to the Legislature. *Lowe,* 540 S.W.2d at 298. Second, for the Legislature to waive sovereign immunity, it must do so by clear and unambiguous language. *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980). Finally, in accordance with section 311.023 of the Code Construction Act, we must construe the waiver provisions of the Tort Claims Act to give effect to the object sought to be attained by the statute. TEX.GOV'T.CODE ANN. § 311.023 (Vernon 1988).[3]

Our construction of section 101.021(2) of the Tort Claims Act and the scope of waiver expressed therein has a long and arduous history. *See Lowe,* 540 S.W.2d at 301 (Greenhill, C.J., concurring); *Salcedo v. El Paso Hospital District,* 659 S.W.2d 30, 32 (Tex.1983). *See also Robinson v. Central Texas MHMR,* 780 S.W.2d 169 (Tex.1989).

**2.** For a history of the Texas Tort Claims Act, *see Texas Department of Mental Health and Mental Retardation Petty,* 848 S.W.2d 680, 686 (Tex. 1992) (Cornyn, J., dissenting).

**3.** Prior to its codification, the Texas Tort Claims Act provided that its provisions "shall be liberally construed to achieve the purposes hereof." TEX. REV.CIV.STAT.ANN. art. 6252–19, § 13 (Vernon 1970) (repealed). When the legislature codified the Tort Claims Act in the Civil Practices and Remedies Code, it did not include the same directive for liberal construction, but rather made the Act subject to the general principles of statutory construction provided in the Code Construction Act. Section 311.023 provides that in construing a statute, a court may consider the object sought to be attained, circumstances under which the statute was enacted, legislative history, common law or former statutory provisions, including laws on the same or similar subjects, consequences of a particular construction, administrative construction of the statute, and the title, preamble, and an emergency provision of the statute. TEX.GOV'T.CODE ANN. § 311.023.

In *Lowe*, this Court held that the State had waived immunity for providing a defective football uniform, in this case a uniform without a knee brace. *Lowe*, 540 S.W.2d at 300. The Court in *Lowe* also held that the alleged failure to furnish a knee brace was indistinguishable from providing a defective uniform and therefore, the alleged failure to furnish also brought this case within the waiver of immunity arising from some condition or use of personal property. *Id.* Chief Justice Greenhill concurred in the opinion on the grounds that the affirmative allegation that the university had furnished defective equipment stated a cause of action under the Tort Claims Act. *Id.* at 303. Chief Justice Greenhill, however, specifically questioned whether the Tort Claims Act required that the injury be proximately caused by some condition or use of tangible personal property and whether nonuse of a non-defective knee brace would be actionable under the Tort Claims Act. *Id.* at 302–03.[4]

*Salcedo* involved the alleged misuse of an electrocardiogram. Specifically, the plaintiff in *Salcedo* alleged that the defendant hospital "misused the [electrocardiogram] equipment and tangible property then and there, by improperly reading and interpreting the electrocardiogram graphs and charts produced by such equipment." *Salcedo*, 659 S.W.2d at 32. The electrocardiogram charts allegedly showed a classic pattern for a heart attack. The government doctor failed to recognize the pattern and sent the patient home. The patient suffered a heart attack and died shortly after returning home. *Id.* at 31. The trial court sustained the hospital's special exceptions on the grounds that the pleadings failed to allege the injuries were caused from some condition or use of tangible property that the hospital provided *in defective condition*. *Id.*

The Court, citing to Chief Justice Greenhill's concurrence in *Lowe*, first noted that the "statutory language 'condition or use' of property implies that such property was furnished, was in bad or defective condition or was wrongly used." *Salcedo*, 659 S.W.2d at 32. The Court held that an allegation of defective or inadequate tangible property is not necessary to state a cause of action under the Act if "some use" rather than "some condition" of the property is alleged to cause the injury. *Id.* In addition, the Court held that the plaintiff had alleged the misuse of tangible personal property in alleging misuse of the electrocardiogram equipment. *Id.* "Use," the Court said, means to put or bring into service or action; to employ for or apply to a given purpose. *Id.* Because reading graphs produced by an electrocardiogram is a purpose for which such equipment is used, the Court held that the plaintiff stated a claim within the statutory waiver provisions of the Texas Tort Claims Act.[5] *Id.*

■ York argues that the present case is analogous to *Salcedo*. We disagree. In *Salcedo*, the plaintiff specifically alleged misuse of the electrocardiogram. Unquestionably, an electrocardiogram is tangible personal property. Although "tangible" is not defined in the Tort Claims Act, there can be little doubt that tangible personal property refers to something that has a corporeal, concrete, and palpable existence.[6]

■ Unlike *Salcedo*, York has not alleged any misuse of any hospital device or equipment. Rather, York complains that UTMB misused tangible personal property by failing to record the events of August 14 and the observations of Richard's parents concerning Richard's condition and further failed to rely on information that was recorded. While the paper on which doctors and nurses may rec-

---

4. Chief Justice Greenhill stated that he was writing his concurrence for the "purpose of encouraging the Legislature to take another look at the Tort Claims Act, and to express more clearly its intent as to when it directs that governmental immunity is waived." *Lowe v. Texas Tech University*, 540 S.W.2d 297, 301 (Tex.1976) (Greenhill, C.J., concurring).

5. With regard to proximate cause, the Court went on to state that the negligent act of the state

employee or officer must be the proximate cause of the injury and that the negligent conduct must involve "some condition or use" of tangible personal property. *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30, 33 (Tex.1983).

6. *See Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex.1992) (when a term is not defined in a statute, courts give words their ordinary meaning).

ord information about a patient's condition is tangible in that paper can be seen and touched, information itself is an abstract concept, lacking corporeal, physical, or palpable qualities. Information thus, is intangible; the fact that information is recorded in writing does not render the information tangible property. *See Jefferson County v. Sterk,* 830 S.W.2d 260, 262 (Tex.App.—Beaumont 1992, writ denied); and *Robinson v. City of San Antonio,* 727 S.W.2d 40, 43 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). *Salcedo* does not permit claims against the State for misuse of information. *Accord, Jefferson County,* 830 S.W.2d at 262 (capias not tangible personal property); *Eakle v. Texas Dept. of Human Services,* 815 S.W.2d 869, 873 (Tex. App.—Austin 1991, writ denied) (papers memorializing discretionary acts do not waive immunity); *Montoya v. John Peter Smith Hospital,* 760 S.W.2d 361, 364 (Tex.App.—Fort Worth 1988, writ denied) (blank triage form not tangible property because triage form unlike electrocardiograph, did not record a tangible condition); *Russell v. Texas Dep't of Human Resources,* 746 S.W.2d 510, 513 (Tex.App.—Texarkana 1988, writ denied) (use of child abuse forms not use of tangible property); *Robinson,* 727 S.W.2d at 43 (protective order not tangible personal property because the order was a decision of the court and fact that it had been reduced to writing did not transform the decision into tangible property); *Wilkins v. State,* 716 S.W.2d 96, 98 (Tex.App.—Waco 1986, writ ref'd n.r.e.) (issuance of permit for trailer not use of tangible property). *But see, City of Houston v. Arney,* 680 S.W.2d 867, 874 (Tex.App.—Houston [1st Dist.] 1984, no writ) (failure to keep documentation in medical records actionable under Tort Claims Act); *Jenkins v. State,* 570 S.W.2d 175, 177–78 (Tex.Civ. App.—Houston [14th Dist.] 1978, no writ) (medical record tangible property).

York's position, and that espoused by the plurality in *Petty,* goes beyond *Salcedo.* Such a position effectively eliminates the tangible property requirement of section 101.021(2). The State would be subject to liability in all cases in which the State has used, misused, or failed to use information that has been reduced to writing. Waiver of governmental immunity, and imposition of the financial burden resulting from waiver on the taxpayers of this State, is a determination to be made by the Legislature. *Lowe,* 540 S.W.2d at 298. In providing for waiver of governmental immunity for injuries caused by the use of tangible personal property, the Legislature has not, by clear and unambiguous language, eliminated governmental immunity for injuries resulting from the misuse of information, even if that information is recorded in writing. *See Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980). We hold that information, which may or may not be recorded in a patient's medical records, does not constitute tangible personal property under section 101.021(2) of the Texas Tort Claims Act and that the State has not waived governmental immunity for negligence involving the use, misuse, or nonuse of information in a patient's medical records.[7]

The judgment of the court of appeals is reversed and judgment is rendered in favor of UTMB.

GAMMAGE, Justice, joined by DOGGETT and SPECTOR, Justices, dissenting.

I respectfully dissent. The majority engages in pure legal fiction to rewrite section 101.021 of the Tort Claims Act to reach the result it desires. En route, the majority fails to recognize or distorts the application of our decisions in *Texas Department of MHMR v. Petty,* 848 S.W.2d 680 (Tex.1992);[1] *Robinson*

---

**7.** To the extent that *City of Houston v. Arney,* 680 S.W.2d at 874, and *Jenkins v. State,* 570 S.W.2d at 177–78, hold otherwise, these cases are expressly disapproved. *See supra* 871 S.W.2d at 179.

**1.** The majority, while conceding *Petty* has at least "limited precedential value," simply dismisses the decision as though it decided the one case only and has precedential value only in identical

cases. Under the "classical theory of precedent," the majority view is correct. Linda Novak, Note, *The Precedential Value of Supreme Court Plurality Decisions,* 80 Colum.L.Rev. 756, 756 n. 1 (1987). Under contemporary theories of precedent, however, the specific result of *Petty* is also required any time substantially the same material facts are presented. *Id.* at 760–61, 769. I make these remarks not to overstate the value of the *Petty* decision, but to correct the majority's disregard of it.

*v. Central Texas MHMR,* 780 S.W.2d 169 (Tex.1989); and *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297 (Tex.1976). More significantly, the majority fails to distinguish *Salcedo v. El Paso Hospital District,* 659 S.W.2d 30 (Tex.1983), in any meaningful way. It would be far more honest for the majority to state openly that it is overruling *Salcedo*—not because that decision's statutory construction and analysis were wrong, or because the legislature failed to acquiesce in it, but because the majority dislikes the result.

Let us start with statutory construction. The statute refers to "a condition or use of tangible personal or real property."[2] The paper comprising York's file is tangible—you can hold it in your hand. The statute's language is clear and unequivocal. It requires no extensive reasoning to analyze it or construe it. Legislation has not changed it, particularly not after this court's decisions in *Lowe* (approximately 18 years ago); *Salcedo* (11 years); *Robinson* (5 years); or even *Petty* (2 years).[3]

The majority engages in the use of legal fiction to construe the language of the statute away—to say that it does not say something it does say—to modify its clear and unambiguous terms. The majority modifies it to say that a file and its contents cannot be held in your hand. The majority works this smoke-and-mirrors sleight-of-hand by rationalizing that it is not the physical file that counts, but

the "mental" informational content, which it concludes is not "tangible." To say that the utility of that file is not the substantive object of the statute is absurd. One might as well say the proper utility of a wrench, vehicle, or other machine or material item is not the real object of the statute. The worker who makes the "mental error" of loosening the wrong bolt with his wrench, causing an accident, makes no more or less use of the tangible property than the physicians and health care professionals did here. It is the proper *use,* or *misuse,* of items that is addressed in specific terms in the statute, and no amount of legal sophistry or disingenuous intellectual gymnastics can change that.

Further, at least with respect to *Salcedo,* a majority of those comprising the present majority have admitted there is no meaningful distinction. In the unanimous *Salcedo* opinion we held that misreading and misinterpreting an electrocardiogram was actionable under the Tort Claims Act as "use (misuse) of" tangible property. *Salcedo,* 659 S.W.2d at 33. It makes no sense to distinguish between diagnostic information recorded by a machine and that recorded by a human being, as the *Petty* plurality opinion explained at length.[4] In *Petty,* the dissenting opinion (joined by four of the members comprising the current majority) states: "I agree that there is no principled distinction between Ms. Petty's treatment records and the

---

2. TEX.CIV.PRAC. & REM.CODE ANN. § 101.021(2) (1986).

3. Each decision after *Lowe* specifically noted legislative acquiescence in the prior constructions of the terms in question. *See Petty,* 848 S.W.2d at 683–84; *Robinson,* 780 S.W.2d at 171; *Salcedo,* 659 S.W.2d at 32.

4. As our *Petty* lead opinion states:

> Just as the electrocardiogram was useful as a diagnostic tool because of the information it contained, so are Ms. Petty's records. Just as this court recognized that the purpose of the graph in *Salcedo* was to develop a diagnosis following reading and interpretation, so were Ms. Petty's records made for use by Department personnel as a diagnostic tool and prognostic device to treat her.
>
> The distinctions the Department suggests we draw between the facts before us and those in *Salcedo* involve no substantive difference. The

first would condition liability on whether the records were generated by a machine or documented by humans. In the latter situation, the Department contends, the intervening exercise of human judgment in determining what observations to record is distinguishable from the same observations mechanically made. Many records used in diagnosing illnesses, both physical and mental, could be generated by either means. Ms. Petty's behavior could have been preserved by videotape or other recording devices rather than by human notes. A temperature could be recorded by machine or be handwritten by a nurse. In *Salcedo,* we stressed not the *method* of generating information, but the *purpose* for which it was intended. There, the electrocardiogram was created for the purpose of being *used* to make a diagnosis. Here Ms. Petty's records, ranging from observations to standardized tests and test results, were generated for the very purpose of making a diagnosis and recommending a course of treatment.

graph in *Salcedo,* but as in the case of all medical records, the purpose of an electro-cardiogram graph is to convey information to a physician, who then uses professional judgment to make treatment decisions." *Petty,* 848 S.W.2d at 688 (Cornyn, J., dissenting). The dissent in *Petty* exhibited more honesty by calling for *Salcedo* to be overruled than does the current majority[5], which would do better to admit it overrules *Salcedo* despite legislative ratification of the *Salcedo* construction of the statute.[6]

Even without *Petty* and *Salcedo,* this should be an easy case based on this court's writings in *Robinson* and *Lowe,* especially in light of related cases. The Yorks allege the responsible hospital personnel failed to record physical information on the son's chart which would have indicated he had broken his hip, presumably during therapy, on or about August 14, and then failed to respond appropriately to information which was on the chart. On August 17 a physical therapist made an entry on the son's medical chart recommending that the physician order an X-ray of the hip. The physician failed to order the X-ray until August 21, and it was not taken until August 22. The Yorks introduced expert medical testimony that it was not good medical practice to delay five days before taking the recommended X-ray under the circumstances reflected in the chart. The question submitted to the jury limited the consideration of "condition or use" of tangible property to a "wheelchair" and the "keeping of files, records or other documentation." The jury found the latter was the proximate cause of injuries to the son. In short, the Yorks alleged and the jury found the hospital negligent in the "condition or use" of the tangible property of the patient records and files because the hospital provided some, but not all, of the records necessary to prevent injury.

*Petty,* 848 S.W.2d at 683 (footnotes omitted).

**5.** *The* Petty *dissenting opinion offers the following rationalization, suggesting overruling* Salcedo:

In *Salcedo* I believe we incorrectly blurred any distinction between tangible property that is itself the instrument of harm and property such as writings or records, which are part of

Under our holdings in *Robinson* and *Lowe,* this was sufficient to waive governmental immunity under the Tort Claims Act. In *Lowe,* a college football player was injured when he removed his knee brace at the coach's order. This court stated that the failure to furnish proper protective items as *part of the uniform* was a "condition or use" waiving immunity under the Act. *Lowe,* 540 S.W.2d at 300 (emphasis added). In *Robinson,* the MHMR unit knew the patient suffered epileptic seizures that occasionally caused him to lose consciousness. The unit further supplied swimming attire to its patient. Life preservers were available, and in fact one was supplied to another, but not to the epileptic. We held that the failure to furnish all proper swimming attire necessary for his safety was a "condition or use" of the tangible property involved, waiving immunity under the Tort Claims Act. *Robinson,* 780 S.W.2d at 171.

Moreover, the *Robinson* and *Lowe* holdings, that the negligent failure to furnish some item of property necessary to make safe the tangible property actually supplied invokes the "condition or use" waiver of the Tort Claims Act, are neither unique nor new. If the state furnishes something tangible, it is not excused from furnishing other complementary property to make it safe. *See, e.g., Trinity River Authority v. Williams,* 689 S.W.2d 883 (Tex.1985) (failure to provide warning signs or barrier across reservoir); *McGuire v. Overton Memorial Hospital,* 514 S.W.2d 79 (Tex.Civ.App.—Tyler 1974), *writ ref'd n.r.e. per curiam,* 518 S.W.2d 528 (Tex. 1975) (failure to provide bed rails); *Mokry v. University of Texas Health Science Ctr.,* 529 S.W.2d 802 (Tex.Civ.App.—Dallas 1975, writ ref'd n.r.e.) (failure to provide proper laboratory equipment).

The majority's dismissal of this body of authority as "non-use" is nothing but adoption of the views of dissenting opinions spe-

a setting in which harm occurs and which merely memorialize information and ideas. We also erroneously eliminated the use of tangible property from the analysis of proximate cause, and by so doing left the state open to suit for virtually any activity.

*Petty,* 848 S.W.2d at 688 (footnotes omitted).

**6.** *See* Petty, 848 S.W.2d at 683–84.

cifically rejected by our prior decisions, in which the legislature has acquiesced. I have no trouble agreeing that a pure "non-use" of property would not give rise to waiver under the Tort Claims Act. But the majority takes a microcosmic view of what is the "tangible property" to conclude there is "non-use." The majority ignores the tangible property actually used or supplied to rationalize ignoring the duty to furnish complementary items of property necessary to make it safe.

In *Lowe* it was not a "non-use" of the knee brace or other protective items that prompted this court's holding. It was the failure to furnish the protective items as complementary to or part of the uniform that was furnished. In *Robinson* the life preserver not furnished was not the "tangible" property,[7] but the broader swimming attire, for which the complementary life preserver was necessary to make the tangible property safe under the circumstances. In *Trinity River Authority*, it was not warning signs or barrier cable that the authority failed to furnish that were "non-used," but the reservoir of the dam known to be used for swimming which was subject to dangerous back-tow when the floodgates opened, that was the relevant tangible property. In *Overton Hospital* it was not the "non-use" of the bed rails that preserved the state's governmental immunity, but rather the failure to provide bed rails as a necessary safety feature of the bed provided, that was the negligent "condition or use" waiving immunity. Likewise, in *Mokry*, the "non-use" of laboratory equipment necessary for the proper diagnosis and treatment did not protect the health center through governmental immunity. It was a negligent "condition or use" of the laboratory equipment provided that failed to furnish what was necessary for the patient's diagnosis and treatment that waived immunity.

After years, even decades, of legislative acquiescence in this interpretation that a condition or use of the tangible property in issue includes a failure to furnish complementary items necessary to make it safe, the majority now obliterates that established sensible construction of the statutory language. The majority declares that henceforth we look to the complementary property that was not furnished, conclude it was "non-used," disregard the tangible property that was used, and excuse the government from its negligence. The majority adopts the approach specifically rejected by this court before, and declares that meaning to which the legislature has *never* even implicitly agreed as sound. This court will henceforth inflict injustice on the citizens of our state meant to be protected by the Tort Claims Act, without regard to the established purpose and meaning of section 101.021. For these reasons, I dissent.

---

7. This is, however, what the *Robinson* dissenting opinion argued, admitting "I confess that not all the consequences of construing 'use' to exclude 'non-use' seem entirely sensible. For example, had the state mental health center in this case negligently supplied Robinson's grandson with a defective life preserver, resulting in his death, its liability would be beyond question." *Robinson,* 780 S.W.2d at 175 (Hecht, J., dissenting). The dissent thus admitted its "non-use" construction led to inconsistent and apparently unjust results, which it blamed on the legislature and not its proposed construction. *Cf.* Tex.Gov't.Code § 312.006(a) (1986) (Civil statutes "shall be liberally construed to achieve their purpose and to promote justice.").